## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: )<br>)<br>BLUE EAGLE FARMING, LLC, et al.[1], )<br>)<br>)<br>Debtor. )<br>) | **Chapter 11**<br>**Case No. 18-02395-TOM11**<br>**(Jointly Administered)** |

## NOTICE OF FILING AFFIDAVIT OF ROBERT BRADFORD JOHNSON

**COME NOW**, Blue Eagle Farming, LLC ("Blue Eagle"), and its affiliated debtors (each a "Debtor" and collectively, the "Debtors" or "Blue Eagle") by and through undersigned counsel, and submits the attached *Affidavit of R. Bradford Johnson in Support of Chapter 11 Petitions and First Day Motions*.

Respectfully submitted, this 11th day of June, 2018.

/s/ Anna W. Akers
Michael Leo Hall
Marc P. Solomon
Anna W. Akers

Proposed Counsel to BLUE EAGLE FARMING, LLC

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

---

[1] In addition to Blue Eagle Farming, LLC, the Debtors include the following entities: (1) War-House Properties, LLC; (2) Eagle Ray Investments, LLC; (3) HJ Farming, LLC; (4) Blue Smash Investments, LLC; (5) Armor Light, LLC; (6) Forse Investments, LLC; and (7) Robert Bradford Johnson.

31761294 v1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | **Chapter 11** |
| BLUE EAGLE FARMING, LLC, et al.[1], ) | **Case No. 18-02395-TOM11** |
| ) | **(Jointly Administered)** |
| Debtor. ) | |

## AFFIDAVIT OF R. BRADFORD JOHNSON IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

STATE OF ALABAMA )

COUNTY OF JEFFERSON )

R. Bradford Johnson, being duly sworn, deposes and says:

## INTRODUCTION

1. My name is R. Bradford Johnson ("Brad Johnson"). I am the owner Blue Eagle Farming, LLC ("Blue Eagle"), and its affiliated debtors (each a "Debtor" and collectively, the "Debtors" or "Blue Eagle"). I am over the age of twenty one (21) and competent to testify regarding the matters contained herein.

2. From June 8 to June 9, 2018 (the "Petition Date"), the Debtors commenced cases under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy

---

[1] In addition to Blue Eagle Farming, LLC, the Debtors include the following entities: (1) War-House Properties, LLC; (2) Eagle Ray Investments, LLC; (3) HJ Farming, LLC; (4) Blue Smash Investments, LLC; (5) Armor Light, LLC; (6) Forse Investments, LLC; and (7) Robert Bradford Johnson.

31755329 v1

Code") in this Court. Debtors will continue to operate its businesses and manage its properties pursuant to Bankruptcy Code §§ 1107(a) and 1108.

3. I submit this affidavit to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases, and in support of Debtors' voluntary chapter 11 petitions and various motions and applications of Debtors filed with the Court contemporaneously herewith in support of the issuance and entry of first day orders. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, and my discussions with the Debtors' employees or agents, or my opinion based upon my experience, knowledge, and information concerning Debtors' operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in this affidavit. I am authorized to submit this affidavit.

**BACKGROUND AND EVENTS LEADING
TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

4. I, Brad Johnson, am the principal and the 95% or more owner of debtors Blue Smash Investments, LLC and War-Horse Properties, LLLP. The remaining debtors are wholly owned subsidiaries of War-Horse Properties, LLLP.

**The Debtors' Relationship with HDL**

5. Effective April 1, 2011, I executed for BlueWave Heath Care Consultants, Inc. ("BlueWave") an independent contractor agreement with Health Diagnostic Laboratory, Inc. ("HDL") related to the marketing and sale of HDL tests in the southeast.

6. HDL was then a competitor of Atherotech, Inc., Boston Heart Diagnostics, Liposcience, and other specialty cardiovascular lab companies.

7. HDL filed a Chapter 11 bankruptcy petition on June 7, 2015 in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Virginia Court").

2

In May of 2016, the Virginia Court confirmed HDL's Chapter 11 plan. As a part of that plan, a liquidating trust was created with Richard Arrowsmith being selected as the liquidating trustee (the "Virginia Trustee").

## The Qui Tam Action in South Carolina

8. On September 26, 2014, a qui tam action was filed against BlueWave, Brad Johnson, and others in the United States District Court for the District of South Carolina (the "Qui Tam Action"). In August 2015, an intervenor complaint was filed by the United States.

9. In the Qui Tam Action, on Saturday, February 6, 2016, the United States applied for a prejudgment remedy against the three individual defendants including Brad Johnson. The United States sought to attach and garnish certain specified property. Some of the property was owned by Brad Johnson and other properties were owned by non-defendant entities affiliated with Brad Johnson in some fashion. Similar proceedings were taken against the other defendants.

10. On Wednesday, February 10, 2016, the South Carolina Court entered an order granting the United States' application for certain prejudgment remedies (the "Prejudgment Order") under the Federal Debt Collection Procedures Act (the "FDCProcA"). Some writs were issued against the property of Brad Johnson and some were issued against property of the entities affiliated with Brad Johnson in some fashion.

11. The FDCProcA does not "supersede or modify . . . title 11." 28 U.S.C. Sec. 3003(c).

12. The United States apparently contends that the writs issued and served pursuant to the Prejudgment Order were effective and are still effective to constitute liens on certain real property and bank accounts owned by some of the Debtors.

3

13. On January 31, 2018 in the Qui Tam Action, the jury entered a verdict against Brad Johnson and two other individuals, but not any entities, including not BlueWave. The amount of the jury verdict was $16,601,591.00. The Judge then trebled the verdict and added other amounts to the civil judgment to bring the total amount of the judgment to more than $110,000,000.00 (the "Judgment").

14. Post-trial motions were filed in the Qui Tam Action and generally denied on May 23, 2018.

15. The time for appeal of the Judgment has not yet run.

### The Virginia Adversary Proceeding

16. On March 9, 2018 the Virginia Trustee filed an adversary proceeding against Brad Johnson and others (the "Virginia Adversary Proceeding") seeking to impose a constructive trust on certain of the defendants named therein and certain of their assets.

17. The defendants in the Virginia Adversary Proceeding also include some of the Chapter 11 Debtors in this bankruptcy proceeding, namely Blue Eagle Farming, LLC ("Blue Eagle"), Forse Investments, LLC, ("Forse") Eagle Ray Investments, LLC, ("Eagle Ray") War-Horse Properties, LLLP, ("War-Horse"), H J Farming, LLC, ("HJ Farming") and Blue Smash Investments, LLC ("Blue Smash").

18. The United States is also named as a defendant in the Virginia Adversary Proceeding.

19. The defendants generally have filed motions to dismiss the complaint, with a hearing on the motions presently scheduled for September.

### Brad Johnson

20. I, Brad Johnson grew up in Alabama, lettered on three football teams that won the Southeastern Conference championship, and graduated from Auburn University in 1990 when I began my business career.

21. I, Brad Johnson grew up in Cherokee County, Alabama, where I received a full scholarship to play football at Auburn University. I am married, and have five daughters, two of which have special needs. In addition, my wife and I have custody of one 16 month old special needs foster child.

## The Commercial Entities

22. Brad Johnson owns 100% of each of Eagle Pharmacy, Inc. and Royal Blue Medical, Inc., each of which are active related commercial businesses in the compounding pharmacy industry segment. Royal Blue has approximately forty five (45) individuals who are independent contractors. These independent contractors market the pharmaceutical products manufactured and sold by Eagle Pharmacy. Eagle Pharmacy has a dozen or so employees who manufacture the pharmaceutical products and run the business. Eagle Pharmacy's and Royal Blue's business and financial prospects are bright.

23. Brad Johnson owns 100% of Blue Smash, which holds various investments.

24. Brad Johnson owns 95% of War-Horse. War-Horse owns 100% of each of Eagle Ray and Forse, each of which own commercial and multi-family real estate with tenants. War-Horse also owns 100% of each of Blue Eagle and HJ Farming, each of which are active cattle farms. Most of these entities are located in Blount County.

25. Brad Johnson owns 50% of each of BlueWave and Cobalt Healthcare Consultants, Inc., which businesses are generally inactive. The United States claims to have a lien on some of their cash assets totaling around $250,000.

5

26. Other than the two frozen bank accounts, there are no liens on Debtors' cash and accounts.

27. Debtors currently have sufficient cash to fund their operations.

## A Reorganization

28. This case is in its infancy and the Debtors have retained their restructuring experts only very recently.

29. Some of the Debtors' assets have substantial value, which value is greater as a going concern than in liquidation.

30. These assets include ownership of operating businesses some of which are, at least initially, not in bankruptcy. They include an active compounding pharmacy with a number of employees, a number of independent contractor salesman, active cattle farms with employees, commercial real estate, and over 45 single family rentals.

31. Both Eagle Pharmacy which manufactures and sells pharmaceutical products and Royal Blue have excellent financial prospects as long as they continue to operate. The primary constraint upon the success of the business is the amount of product it can manufacture. Eagle Pharmacy is more than half way through a construction project to expand production capacity. This valuable business has good prospects as a going concern when led by Brad Johnson; it would little value in a liquidation or even when operating but divorced from Brad Johnson.

32. The collective present value of all of the assets of all the Debtors is less than the amount of the Judgment held by the United States; the value of the assets is far greater than the collective amount of all of the other debts and claims. And of course, the Judgment will be appealed.

6

33. In general terms, a Chapter 11 reorganization is likely to include the sale of some of the assets, some perhaps as going concerns. Other assets may be retained from which regular payments could be made to creditors for a number of years.

34. Even if there were ultimately to be a liquidation, the experience and expertise of bankruptcy courts and its professionals should result in a higher recovery than would be obtained elsewhere.

## FIRST-DAY MOTIONS AND APPLICATIONS

35. Concurrently with the filing of these chapter 11 petitions, Debtors filed certain applications, motions and proposed orders (the "First Day Motions"). Debtors request that each of the First Day Motions described below be entered, as each constitutes a critical element in achieving a successful rehabilitation and reorganization of Debtors for the benefit of all parties in interest.

### Debtors' Motion to Pay Prepetition Wages and Employee Benefits

36. In the ordinary course of its business, Debtors incur payroll obligations to approximately 4 employees for the performance of services in connection with its operations. Approximately 2 employees work on an hourly basis and approximately 2 employees are salaried employees (hourly and salaried employees together referred to as the "Employees"). Approximately 1 Employee is a part time worker.

37. Prior to the Petition Date, Debtors paid its Employees on a bi-weekly pay cycle. Debtors' average weekly payroll for all Employees is approximately $7,500.00 excluding outstanding payroll checks ("Outstanding Payroll Checks") that may have been issued but not cleared Debtors' banks as of the Petition Date. Employees are paid in arrears. None of the Debtors' are paid by direct deposit. Debtors' Outstanding Payroll Checks could total as much as

7

$7,500.00. Debtors seek to pay only up to that approximate amount. Debtors will seek further approval from this Court if circumstances arise that would require Debtors to exceed that amount.

38. Debtors are required by law to: (a) withhold from the Employees payrolls, and remit to the appropriate taxing authorities, certain federal, state, and local income taxes, social security and Medicare taxes (collectively, the "Payroll Tax Obligations") and (b) directly pay state and local unemployment taxes and contributions (the "Unemployment Taxes"). Debtors' obligations in respect of Payroll Tax Obligations and Unemployment Taxes are paid by non-debtor affiliate Royal Blue Medical, Inc. ("Royal Blue"). Debtors then reimburse Royal Blue for these expenses.

39. Under Debtors' pre-petition payroll system, the Wage and Salary Obligations, obligations in respect to the Outstanding Payroll Checks, Payroll Tax Obligations, and Unemployment Tax Obligations (collectively, the "Compensation Obligations") owed to the Employees, or required to be paid on their behalf, which have accrued since the date such amounts were last paid by Debtosr, normally would be paid by non-debtor Royal Blue.

40. Employee Benefits. Debtors have established various plans and policies for the benefit of its Employees, which include medical and health insurance, and other such similar benefits (collectively, the "Employee Benefits"). Royal Blue pays these benefits, and each debtor reimburses Royal Blue.

41. Expenses & Reimbursement. With regard to the payment of business expenses, Brad Johnson typically uses company purchase cards to pay expenses including, among other expenses, those incurred in connection with travel, such as meals, lodging, mileage, and other miscellaneous expenses as may be incurred from time to time.

42. Further, Debtors customarily reimburses Brad Johnson and Directors who incur a variety of business expenses in the ordinary course of performing their duties on behalf of Debtors.

8

These reimbursable business expenses include, among other expenses, those incurred in connection with travel, such as meals, lodging, mileage, and other miscellaneous expenses as may be incurred from time to time. In some instances, Brad Johnson and Directors may use personal credit cards for which Brad Johnson or Director pays the bill and upon submission of the receipt, is then reimbursed by Debtors. Because Brad Johnson and Directors do not always submit claims for reimbursement promptly, it is difficult for Debtors to determine the exact amount outstanding at any particular time. Debtors seek to pay only up to the amount required for reimbursement pre-petition. Debtors will seek further approval from this Court if circumstances arise that would require Debtors to exceed that amount.

43. <u>Other Administrators.</u> As is customary in the case of most large companies, Debtors utilize the services of a payroll processor in connection with the Compensation Obligations and administrators, consultants, actuaries, recordkeepers, and other service providers (the "Service Provider") in the ordinary course of its businesses in order to facilitate the administration, record keeping, and maintenance of certain Employee Benefits. Debtors estimate that, on account of services provided to Debtors by the Service Provider prior to the Petition Date (the "Administrative Obligations"), such obligations total approximately $0, however to the extent that such obligations arise, Debtors seek to pay that amount and will seek further approval from this Court if circumstances arise that would require Debtors to exceed that amount.

**Debtors' Motion to Establish Case Management Procedures**

44. The procedures are designed to secure the expeditious and economical determination of every matter, and to afford specific notice to all parties in interest of the applicable deadlines and hearing dates well in advance of such deadlines and dates. Such procedures will also minimize the amount of time at hearing dates that is devoted to scheduling matters and

9

continuances.  Finally, such procedures should assist all parties in interest by affording the parties and the Court reasonable time to prepare for hearing dates and hopefully narrow the issues raised in their respective filings.

45. The establishing of Omnibus Hearing Dates in particular will promote the efficient and orderly administration of this case.  Early notice to all parties of regularly scheduled hearings will enable everyone to plan efficiently for the use of hearing time, will avoid much of the need for emergency hearings, and will lessen the burden on the Court and on Debtors' estates.  For these reasons, Debtors believe that a schedule of Omnibus Hearing Dates is in the best interest of Debtors' estate.

46. Debtors believe that adopting the case management procedures proposed herein will substantially reduce administrative burdens and result in substantial cost savings to Debtors' estate because of the reduction of time and money Debtors will have to expend on the several hearings and documents that otherwise will be filed in this case.  Further, Debtors believe adopting such procedures will also significantly reduce the administrative and economic burden placed on creditors and parties-in-interest when filing and serving the documents in this case and appearing at hearings.

**Debtors' Motion to Determine Adequate Assurance for Utilities**

47. In connection with the operation of its businesses and the management of its properties, Debtors obtain telephone, electricity, gas, water, sewer, waste management, and other similar services (collectively, the "Utility Services") from different companies (the "Utility Companies").  Should one or more of the Utility Companies refuse or discontinue service even for a brief period, operations of Debtors would be severely disrupted.

10

Case 18-02395-TOM11    Doc 19    Filed 06/11/18    Entered 06/11/18 16:15:41    Desc Main
Document      Page 11 of 19

48. Contemporaneously herewith, Debtors have requested authorization to use cash collateral which, if approved, will provide Debtors with sufficient availability of funds with which to pay all post-petition utility charges.

49. Debtors' aggregate monthly expenditure for all of the Utility Services provided by all of the Utility Companies, calculated upon the historical average of utility charges incurred by Debtor over the twelve (12) months before the Petition Date, is approximately $400.00.

**Debtor's Motion to Extend Time to File Schedules and Statement of Financial Affairs**

50. Debtors are in the process of compiling and organizing the information required for the Schedules and its List, but the finalization of these documents will extend past the Fourteen-Day Period. Debtors have been primarily focused on assessing its business operations and negotiating a course of action.

51. Debtors include numerous businesses and an individual. Because of (a) the size and scope of Debtors' businesses; (b) the complexity of its financial affairs; and (c) the press of numerous business matters incident to the commencement of this case, it was impracticable for Debtors to assemble all of the information necessary to complete the Schedules prior to the Petition Date.

52. Moreover, Debtors have known and potential creditors. Under the circumstances, Debtors submit that the Fourteen-Day Period within which to file the Schedules under Bankruptcy Rule 1007(b) and (c) will not provide Debtor with sufficient time to complete the same.

53. The substantial size, scope and complexity of this case, and the volume of material that must be compiled provides ample "cause" justifying the requested extension beyond the Fourteen-Day Period.

11

54. Debtors contend that an extension, for an additional twenty-one (21) days, of the deadline to file the Schedules would be appropriate at this time. Debtors request that such extension be without prejudice to its right to seek one or more further extensions of this deadline from the Court. Additionally, Debtors will work with the Office of the Bankruptcy Administrator for the United States Bankruptcy Court for the Northern District of Alabama, Southern Division (the "Bankruptcy Administrator") and any subsequently officially-appointed committee of creditors to make available sufficient financial data and creditor information prior to the initial § 341 meeting to be timely held.

55. For these reasons, Debtors request that the Court grant Debtor twenty-one (21) days from the Petition Date to file all Schedules, subject to Debtors' right to seek further extensions from the Court.

56. Based on the foregoing reasons, Debtors submit that good and sufficient cause exists for granting Debtors additional time to file the Schedules.

**Motion Regarding Cash Management System**

57. <u>Debtor's Pre-petition Cash Management System</u>. In the ordinary course of its business and prior to the Petition Date, Debtors used a Cash Management System. The Cash Management System is designed to efficiently collect, transfer and disburse funds generated through Debtor's operations and to accurately record such collections, transfers and disbursements as they are made. As part of the Cash Management System, Debtor maintains bank accounts with Cadence Bank, People's Bank, Merk Federal Credit Union, Merchants Bank of Alabama, BBVA Compass, Scottrade, Alabama Credit Union, and Regions Bank (together, the "Bank Accounts").

58. Additionally, Debtors each reimburse non-debtor Royal Blue for expenses.

59. Debtors maintain current and accurate accounting records of daily cash transactions.

60. <u>The Post-Petition Cash Management System.</u> Debtors' cash management procedures have been employed for a considerable period of time and constitute ordinary course, essential business practices. The Cash Management System provides significant benefits to Debtors including, *inter alia*, the ability to: (i) control corporate funds; (ii) ensure the maximum availability of funds when necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

61. Debtors' business operations require that the existing Cash Management System continue during the pendency of these chapter 11 cases, as any disruption could have a severe and adverse impact upon the reorganization efforts of Debtors. Further, the process of establishing a new cash management system would be a lengthy and expensive process and a substantial burden to the estates.

62. Debtors will continue to maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be documented in its books and records to the same extent such information was maintained by Debtors prior to the Petition Date. Based upon the foregoing, Debtors submit that the maintenance of the existing Cash Management System is essential, appropriate, and in the best interest of Debtors' estates and all parties in interest.

63. Debtors seek a waiver of any requirements which mandate, among other things, that the Bank Accounts be closed and that new post-petition bank accounts be opened. If any such requirements were enforced in the instant chapter 11 cases, the requirements would cause enormous disruption of Debtors' business and impair its ability to reorganize.

Case 18-02395-TOM11    Doc 19    Filed 06/11/18    Entered 06/11/18 16:15:41    Desc Main
Document    Page 14 of 19

64. Debtors believe that the transition into chapter 11 will be smoother and more orderly, with a minimum of disruption to operations, if the Bank Accounts are maintained with the same account numbers following the commencement of this case.

65. By preserving business continuity and avoiding the disruption and delay that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers will be best served. The benefit to Debtors, its business operations and all parties in interest will be considerable in view of the fact that Debtors maintains numerous Bank Accounts. The disruption that would otherwise result, absent the relief requested herein, would ill-serve Debtors' rehabilitative efforts.

**Debtors' Motion Authorizing Continuance of Debtors' Workers' Compensation Program, All Other Insurance Policies, All Agreements Relating Thereto, and Pay All Obligations Relating Thereto.**

66. In the ordinary course of its business, Debtors maintain numerous insurance policies and workers' compensation programs (collectively, and as more described in detail below, the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers"). The Insurance Programs include, workers' compensation plans, automobile insurance, general and professional liability insurance, directors' and officers' liability insurance, and employment practices liability insurance.

67. <u>Workers' Compensation Program</u>. Under the laws of the state in which they operate, Debtors are statutorily required to maintain workers' compensation and employer's liability policies and programs (collectively, the "Workers' Compensation Program"), and to provide their employees with workers' compensation coverage for claims arising from or related to their employment with Debtors. Royal Blue Medical, Inc. ("Royal Blue"), a non-debtor pays

14

Case 18-02395-TOM11    Doc 19    Filed 06/11/18    Entered 06/11/18 16:15:41    Desc Main
Document    Page 15 of 19

the Debtors' Workers' Compensation premiums, and then each debtor reimburses Royal Blue for the amount.

68. There are currently no outstanding Workers' Compensation Claims.

69. <u>Other Property, Casualty and Liability Insurance Programs</u>. In addition to the Workers' Compensation Programs and General Liability Programs, Debtor also maintains other property, automobile, casualty, and liability insurance policies, which provide Debtors with insurance coverage for claims relating to, among other things, property and automobiles.

70. Debtors are required to pay premiums for these policies based upon a rate established and billed by the respective Insurance Carrier. The premiums for most of these policies are determined annually and are paid directly to the Insurance Carrier.

71. These Workers' Compensation and Insurance Programs are essential to the ongoing operation of Debtors' business because Debtors would be exposed to substantial liability for any damages resulting to persons and property of Debtors and others, in the event such policies were terminated for non-payment. Therefore, Debtors are requesting authority to pay any and all amounts due and owing with respect to these insurance policies, and maintain and continue pre-petition practices with respect to these insurance programs, including among other things, allowing claimants, to the extent they hold valid claims under the applicable insurance policy or program, to proceed with their claims directly against the respective Insurance Carrier(s).

**Debtors' Motion For Order Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course of Business**

72. Debtors customarily retain the services of various attorneys, accountants, tax professionals and other professionals to represent it in matters arising in the ordinary course of its business (the "Ordinary Course Professionals").

15

73. Debtors desire to continue to employ and retain the Ordinary Course Professionals to render services to its estate that are similar to those rendered before the commencement of these Chapter 11 cases. Although the automatic stay and other issues in this case may decrease the Debtors' need for certain Ordinary Course Professionals' services, Debtors cannot now quantify or qualify that need.

74. Debtors request that all Ordinary Course Professionals be excused from submitting separate applications for proposed retention. Debtors recognize, however, the importance of providing the Court and the Office of the Bankruptcy Administrator for the United States Bankruptcy Court for the Northern District of Alabama, Southern Division (the "Bankruptcy Administrator") information about each Ordinary Course Professional who is an attorney ("Attorney Professional").

75. Debtors propose that it be permitted to pay, without formal application to the Court by any Ordinary Course Professional, one-hundred percent (100%) of the interim fees and disbursements to each of the Ordinary Course Professionals upon the submission to Debtors of an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date without further order from the Court.

76. Debtors also request that it be authorized to employ and retain additional Ordinary Course Professionals as necessary, in the ordinary course of its business ("Additional Ordinary Course Professionals"), including additional attorneys ("Additional Attorney Professionals") (a) without the need to file individual retention applications and (b) without the need for any further hearing or notice to any other party, by filing with the Court a supplement (the "Supplement"). The Supplement shall list the name and estimated monthly fee of the Additional Ordinary Course Professional, along with a brief description of the services to be rendered.

16

Case 18-02395-TOM11    Doc 19    Filed 06/11/18    Entered 06/11/18 16:15:41    Desc Main
Document    Page 17 of 19

77.     Debtors request that it be permitted to employ and retain the Ordinary Course Professionals on terms substantially similar to those in effect prior to the Petition Date, but subject to the terms set forth in the corresponding motion.

78.     Debtors submit that the retention of the Ordinary Course Professionals and the payment of interim compensation on the basis set forth herein is in the best interests of Debtors' estates. While generally the Ordinary Course Professionals with whom Debtors have previously dealt wish to provide services to Debtors on an ongoing basis, many may be unwilling to do so if they are subjected to a cumbersome, formal application process. If Debtors lose the expertise, experience and institutional knowledge of these Ordinary Course Professionals, Debtors' estates will undoubtedly incur significant and unnecessary expenses, as Debtors will be forced to retain other professionals without similar expertise and exposure to Debtors.

I respectfully request that all the First Day Motions be entered.

Blue Eagle Farming, LLC

By: _____
R. Bradford Johnson
Owner, Blue Eagle, LLC

Sworn to and subscribed before me
this 11th day of June, 2018.

_____
Notary Public
My commission expires: 10/2021