**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>**BLUE EAGLE FARMING, LLC,** *et al.*,<br><br>    **Debtors.**[1] | **Chapter 11**<br>**Case No.: 18-02395-TOM11**<br>**(Jointly Administered)** |
| **RICHARD ARROWSMITH AS LIQUIDATING TRUSTEE OF THE HDL LIQUIDATING TRUST,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROBERT BRADFORD JOHNSON,**<br><br>**Defendant.** | **Adv. Pro. No. 18-_____** |

**COMPLAINT SEEKING DETERMINATION THAT DEBTS ARE NON-DISCHARGEABLE PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A) AND/OR 523(a)(6)**

COMES NOW Richard Arrowsmith (the "***Plaintiff***" or the "***Liquidating Trustee***"), in his capacity as Liquidating Trustee of the HDL Liquidating Trust (the "***HDL Trust***"), appointed pursuant to the confirmed *Modified Second Amended Plan of Liquidation* (the "***HDL Plan***") of Health Diagnostic Laboratory, Inc., *et al*. ("***HDL***") in the Chapter 11 bankruptcy case pending under Case No. 15-32919 (the "***HDL Bankruptcy Case***") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "***Virginia Bankruptcy Court***"), and files this *Complaint Seeking Determination that Debts are Non-Dischargeable Pursuant to 11*

---

[1] In addition to Blue Eagle Farming, LLC, the Debtors and the last four digits of their tax identification numbers are: War-Horse Properties, LLLP (1798); Eagle Ray Investments, LLC (4818); H J Farming, LLC (3806); Blue Smash Investment, LLC (0095); Armor Light, LLC (1617); Forse Investments, LLC (1045); and Robert Bradford Johnson (8644).

*U.S.C. §§ 523(a)(2)(A) & 523(a)(6)* (the "***Adversary Proceeding***") against defendant Robert Bradford Johnson ("***Defendant***" or "***Johnson***"). The Liquidating Trustee, by and through his undersigned counsel, alleges, upon knowledge and/or information and belief, the following:

## I.      NATURE OF THE ACTION

1.      By this Adversary Proceeding, Plaintiff seeks a determination that the amount(s) of recoverable fraudulent transfers and/or the damages arising from numerous claims asserted in multiple suits by the Liquidating Trustee against Johnson in the Virginia Bankruptcy Court are non-dischargeable pursuant to sections 523(a)(2)(A) and/or 523(a)(6) of title 11 of the United States Code (the "***Bankruptcy Code***").

2.      As described in more detail herein, HDL's former officers and directors designed and carried out improper and fraudulent business practices in violation of multiple laws and in breach of their fiduciary duties. Johnson conspired with and aided and abetted these former directors and officers in perpetuating this fraudulent scheme and took concerted action in furtherance thereof. As a result, Johnson and other parties to the HDL Actions (as defined herein), collectively, received hundreds of millions of dollars in fraudulent transfers in addition to causing hundreds of millions of dollars in damages to HDL and its creditors, including the Assigning Creditors (as defined herein). These practices ultimately led to HDL's bankruptcy, which was filed in the Virginia Bankruptcy Court on June 7, 2015 (the "***HDL Petition Date***").

3.      As contemplated by the HDL Plan, the Liquidating Trustee commenced the following adversary proceedings against Johnson, among other party defendants, each of which are currently pending in the HDL Bankruptcy Case (collectively, the "***HDL Actions***"):

> a.      On September 16, 2016, the Liquidating Trustee filed a complaint commencing *Arrowsmith v. Mallory, et al.*, Adversary Proceeding No. 16-

03271-KRH (the "***D&O Action***"), which asserts claims against Johnson for, *inter alia*, avoidance of fraudulent and preferential transfers, violation of the trust fund doctrine, aiding and abetting breach of fiduciary duty, conspiracy, fraud, assumpsit, unjust enrichment, and tortious interference with contracts, contract expectancy, prospective business relationship and economic advantage of the Assigning Creditors (as defined herein). A copy of the *First Amended Complaint* filed in the D&O Action, Dkt. No. 375, is attached hereto as **<u>Exhibit A</u>** (the "***D&O Complaint***"). The D&O Action also includes claims asserted in Assigning Creditor Aetna, Inc.'s ("***Aetna***") pre-petition lawsuit against Johnson, which case was transferred to the Virginia Bankruptcy Court and assigned Adv. Pro. No. 16-03349, and which complaint was incorporated by reference in the D&O Complaint. Adv. Proc. No. 16-03349 was also administratively stayed pending determination of the D&O Action by the Virginia Bankruptcy Court by order entered on February 2, 2017 [Adv. Pro. No. 16-03349, Dkt. No. 7].

b.  On June 6, 2017, the Liquidating Trustee filed a complaint commencing *Arrowsmith v. Mallory, et al.*, Adversary Proceeding No. 17-04300-KRH (the "***Tax Action***"), which asserts claims against Johnson for, *inter alia*, breach of contract, aiding and abetting breach of fiduciary duty, and conspiracy. A copy of the *Amended Adversary Complaint* filed in the Tax Action, Dkt. No. 63, is attached hereto as **<u>Exhibit B</u>** (the "***Tax Complaint***"). The Tax Action has been consolidated with the D&O Action by order of the Virginia Bankruptcy Court entered on September 1, 2017 [Tax Action, Dkt

No. 67].

4.     Other entities have brought actions against Johnson for wrongdoing associated with HDL, including a *qui tam* action, *United States of America, et al. vs. BlueWave Healthcare Consultants, Inc. et al.*, Case No. 14-cv-00230-RMG (Sept. 26, 2014) (the "***Qui Tam Action***"), which was tried before the United States District Court for the District of South Carolina, Beaufort Division (the "***Qui Tam Court***").

5.     On January 31, 2018, a jury returned a verdict in the Qui Tam Action finding that Johnson along with Floyd Calhoun Dent, III ("***Dent***") and HDL's former CEO LaTonya S. Mallory ("***Mallory***") had violated the False Claims Act, 31 U.S.C. §§ 3729-3733 ("***FCA***").  The jury further determined that the total value of claims for services made by HDL that violated the FCA amounted to $16,601,591.00. *See* Qui Tam Action, Dkt. Nos. 870 & 910.

6.     On May 23, 2018, the Qui Tam Court entered judgment against Dent and Johnson, in the amount of $111,109,655.30 for their HDL-related conduct, inclusive of punitive damages and relators' share (the "***Qui Tam Judgment***"). *See* Qui Tam Action, Dkt. Nos. 910 & 911.

7.     Certain of the causes of actions asserted in the HDL Actions form the claims underlying the debts asserted herein as non-dischargeable under Bankruptcy Code §§ 523(a)(2)(A) and/or 523(a)(6).  Grouped together, these claims against Johnson include: debts owed to Plaintiff for money or property obtained by Johnson by actual fraud in the form of a fraudulent conveyance scheme; debts owed to Plaintiff for money, property, services and/or an extension of credit obtained by Johnson by actual fraud; and debts owed to Plaintiff for willful and malicious injury caused by Johnson to HDL and its creditors, including the Assigning Creditors (as defined herein).

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157(b) and

1334(b). This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(6) and a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (O).

9.      Venue is proper within this district pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      Pursuant to Fed. R. Bankr. P. 7008, this Adversary Proceeding relates to the Chapter 11 bankruptcy cases filed by Johnson and affiliated debtors, on or around June 8, 2018 in the United States Bankruptcy Court for the Northern District of Alabama, Southern Division (the "***Alabama Bankruptcy Court***"), which are jointly administered and currently pending under Case No. 18-02395-TOM11 (the "***Johnson Bankruptcy Case***").

11.      To the extent consent is required, Plaintiff consents to entry of final orders by the Alabama Bankruptcy Court in the Adversary Proceeding.

## III.      PARTIES

12.      Plaintiff Richard Arrowsmith is the Liquidating Trustee of the HDL Trust, a creditor of each of the debtors in the Johnson Bankruptcy Case, and the plaintiff in each of the HDL Actions.

13.      Defendant Johnson is an individual debtor in the Johnson Bankruptcy Case, a defendant in each of the HDL Actions, a shareholder of HDL, and a principal and insider of BlueWave Healthcare Consultants, Inc. ("***BlueWave***").

## IV.      FACTUAL BACKGROUND

### A.      Formation of HDL

14.      Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 427 of the D&O Complaint, and paragraphs 1 through 95 of the Tax Complaint.

15.     Starting in late 2008 through 2009, Mallory and other parties formed HDL as a laboratory in Richmond, Virginia offering blood tests for early detection of cardiovascular disease, diabetes, and related illnesses.

16.     In 2009 and early 2010, on behalf of BlueWave, Johnson and Dent negotiated and entered into an agreement (the "***BlueWave Agreement***") with HDL, whereby BlueWave operated as HDL's exclusive sales agent and marketing consultant. Johnson and Dent are both principals and insiders of BlueWave, each owning a fifty percent (50%) share in the company (Johnson, Dent and BlueWave, collectively, the "***BlueWave Parties***").

17.     The BlueWave Parties further engaged an outside sales force (the "***BlueWave Sales Force***") of independent contractors to operate as sales agents and marketing consultants to HDL and who, together with the BlueWave Parties, took concerted action to advance and carry out the Illicit Scheme, as defined and described further herein.

18.     From its inception, HDL's insiders and the BlueWave Parties, including the BlueWave Sales Force, devised, implemented and/or perpetuated illegal and/or high-risk business practices that incentivized health care providers ("***HCPs***") and patients to order HDL's tests by violating healthcare law, misleading government and non-government health care payers, and interfering with the agreements of private health care payers and/or insurers ("***Private Payer(s)***") with HCPs and patients.

19.     As detailed below, HDL's improper practices included: paying tens of millions of dollars in improper "processing and handling" ("***P&H***") fee kickbacks to HCPs to induce test referrals; implementing a fraudulent billing policy under which HDL charged the government and Private Payers full price for laboratory tests but routinely did not collect patient co-payments, co-insurance, or deductibles; paying BlueWave enormous and improper percentage-based

commissions based on sales revenues to create an armada of sales contractors aggressively pushing HDL's tests; and encouraging and/or inducing HCPs to order medically unnecessary laboratory tests.

20.     As a result of this massive, fraudulent business scheme, HDL grew its minimal footprint in 2009 to a laboratory serving HCPs all over the nation and generating annual revenue of approximately $417 million at its peak in 2012.  These ill-gotten revenues benefitted numerous parties, including Johnson, but injured a significant score of creditors and parties in interest.

**B.     The Illicit Scheme**

21.     At the foundation of this massive scheme were the following three improper and fraudulent business practices, (among other practices, the "***Illicit Scheme***"):

  a.     **P&H Scheme**: To induce referrals to HDL, the company paid P&H fees to HCPs and other laboratories in the amount of at least $17 or more per accession (i.e. the drawing and packaging of a patient's blood sample), in addition to and far in excess of the $3 draw fee permitted under Medicare. This practice violated the federal Anti-Kickback Statute, 42 U.S.C. §1320(a)-7(b)(1)(A) ("***AKS***"), and similar state anti-kickback laws. Payment of P&H fees was a critical part of HDL's business generation model that the BlueWave Sales Force, including Johnson himself, actively marketed to HCPs, and which served to induce HCPs to order tests from HDL in high volumes, even in cases where HCPs were contractually obligated to refer their patients to HDL's competitors.  HDL's P&H fee was immediately and repeatedly challenged by, among others, Private Payers and HDL's customers and competitors who alleged that the practice was

illegal and promoted overutilization and overpayments to HDL. Instead of stopping the practice, however, HDL and the BlueWave Parties actively continued it, even after the United States government began its extensive investigation of HDL in 2012. In total, HDL paid at least $46 million in P&H fees to HCPs, with a single HCP known to have received at least $494,000 in P&H fees.

b. **BlueWave Agreement**: HDL entered into the BlueWave Agreement, which provided for the payment of enormous commissions ranging from 13.8% to 19.8% of the sales revenue HDL collected, resulting in HDL paying BlueWave a staggering amount of over $220 million in less than five years. As a percentage-based compensation arrangement with an independent sales agent the aggregate total of which was not set in advance, the BlueWave Agreement violated the AKS, a point discussed in multiple advisory opinions issued by the U.S. Department of Health and Human Services Office of Inspector General (the "***OIG***") dating back to 1998. *See also* 42 C.F.R. § 1001.952(d). Specifically, the AKS prohibits entities like BlueWave from receiving commission-based remuneration in return for "arranging for" or "recommending" the purchase or order of any "good" or "service" reimbursed by federal health programs. 42 U.S.C. § 1320a-7b(b)(1)(B). Furthermore, the AKS prohibited HDL from paying such remuneration to entities like BlueWave. *Id*.

c. **Patient Responsibility Collection Practice** (the "***PRCP***"): HDL routinely did not collect co-payments, co-insurance payments, or deductibles due

from patients for HDL's blood testing services – all in violation of the AKS, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, and similar state laws. This practice also tortiously interfered with Private Payers' contractual relationships with HCPs and patients, including the contracts of those creditors including Aetna and Connecticut General Life Insurance Company ("*Cigna*") who, along with other creditors (the "*Assigning Creditors*"), assigned to the Liquidating Trustee and the HDL Trust their Creditor Causes of Action, as defined in Section 1.33 of the HDL Plan, pursuant to Section 6.16(a) of the HDL Plan and associated Assignment Agreements (as defined in the HDL Plan). The PRCP was an essential part of HDL's business model that the BlueWave Sales Force, including Johnson, actively marketed to HCPs to bypass the checks and balances of the insurance system by inducing HCPs and patients to use HDL's laboratory services over those of its in-network competitors. This allowed HDL to charge private health insurance payers a substantial premium over its competitors at no direct, incremental expense to the patients. Similar to the P&H Scheme, the PRCP was immediately and repeatedly challenged by, among others, Private Payers and HDL's customers and competitors who alleged that the practice was illegal, promoted overutilization and overpayments to HDL, and both breached and intentionally interfered with Private Payer provider agreements with HCPs and patients.

22. Prior to commencement of the Illicit Scheme, the OIG issued Special Fraud Alerts and Advisory Opinions that indicated, at a minimum, the high-risk nature of the Illicit Scheme.

These include but are not limited to: OIG Special Fraud Alert, 59 Fed. Reg. 65372, 65377 (Dec. 19, 1994); OIG Advisory Opinion, No. 05-08, June 13, 2005; OIG Advisory Opinion, No. 08-06, May 2, 2008. Johnson was or should have been aware of the foregoing based on his career as a salesperson in the health care industry prior to joining BlueWave, his association with HDL, his role with BlueWave, and his conduct in relation to the Illicit Scheme, including his regular interactions with health care professionals.

23. Furthermore, Johnson knew or should have known from the beginning that the Illicit Scheme and the medically unnecessary testing offered to HCPs and patients were improper and illegal. Both he and other parties to the Illicit Scheme were repeatedly warned of the impropriety, illegality and potential consequences of the Illicit Scheme throughout its duration by HCPs, competitors, HDL employees, hired professionals, and ultimately by governments and Private Payers, including the federal government.

24. With all knowledge of the illegality of the Illicit Scheme and in reckless disregard of the known risks associated with these practices, Johnson aided and abetted the Illicit Scheme, conspired with other party defendants to the D&O Action in furtherance thereof, and took concerted action to accomplish the same, all for his benefit and to the detriment of HDL and its creditors, including the Assigning Creditors.

### C. Johnson's Involvement with the Illicit Scheme

25. Johnson was one of the chief architects of the Illicit Scheme, in addition to Mallory, Dent and other directors, officers and insiders of HDL. The P&H Scheme and the PRCP were explicit obligations of HDL under Section 3(c) of the BlueWave Agreement, which provisions Johnson and Dent negotiated and required as a condition of serving as HDL's exclusive sales agent and marketing consultant.

26.     Johnson further facilitated the operation of the Illicit Scheme through both his personal sales efforts and through his control over HDL, BlueWave, the BlueWave Salesforce, and his own entities involved with the Illicit Scheme.

27.     Johnson signed an independent contractor agreement effective April 1, 2011, in which BlueWave named Johnson's company, Royal Blue Medical, Inc., as its representative to market and sell HDL tests in Alabama, Mississippi, Tennessee, parts of Georgia, and the Florida panhandle.  As an individual sales representative, he touted the P&H fees as a revenue stream to and for the economic gain of HCPs, advertised the PRCP as a benefit to HCPs and their patients, and both promoted and enticed HCPs to order large panels of medically unnecessary tests, all of which generated substantially greater profits for HDL and, in turn, greater commissions for Johnson than might otherwise have resulted from the ordering of targeted, individual tests for each patient.

28.     As co-leader of BlueWave with Dent, Johnson trained, managed, oversaw and supported the BlueWave Sales Force, directing them to similarly induce HCPs to order medically unnecessary tests from HDL and to breach Private Payer agreements through the offering of illegal remuneration by way of the P&H Scheme, the PRCP and other illegal kickbacks, inducements and/or benefits.

29.     Numerous characteristics of the P&H Scheme and the PRCP present indicia of intent by Johnson to induce physicians to order more HDL laboratory tests in violation of the AKS, including, but not limited to:

> a.     The contractual requirement for P&H and the PRCP under the BlueWave Agreement suggests that Johnson mandated P&H and the PRCP because he

understood that such payments and/or patient benefits were an integral part of the sales process and necessary to inducing referrals to HDL.

b.    The P&H Scheme combined with the PRCP, by its very nature of paying on a per specimen basis without any base or incremental cost to the physician's patients, resulted in greater revenue flowing to a physician's office when the physician, uninhibited by patient costs, orders a greater number of tests.  The Illicit Scheme, thus, by design is purposed to induce referrals.

c.    The BlueWave sales model taught by Johnson often led or "closed" pitches to physicians with the P&H Scheme and/or the PRCP, which indicates that BlueWave, Johnson and the BlueWave Salesforce sold HDL laboratory tests as a revenue driven opportunity for increasing physician profits, thereby inducing referrals.

d.    Particularly in the case of high ordering practices or regions, the amount of P&H paid to physicians often exceeded the cost of the expense of placing an in-office phlebotomist or operating an independent draw station, which further suggests that the purpose of the Illicit Scheme was to induce physicians to order HDL laboratory tests.

30.    By the foregoing, Johnson also conspired with and aided and abetted others in the perpetuation of the Illicit Scheme, including, but not limited to, the other party defendants to the D&O Action.

**D.     Damages Related to the Illicit Scheme**

31.     The Illicit Scheme defrauded Private Payers, such as Aetna, Cigna and other Assigning Creditors, out of hundreds of millions of dollars in claims paid to HDL.  The Illicit Scheme also exposed HDL to immense liabilities to federal and state governments for violations of the FCA and AKS.

32.     The amount of the damages asserted in the HDL Actions and arising out of the Illicit Scheme as well as the Revocation, which relates to the Tax Action and is described further below, will be determined at trial.  The Liquidating Trustee estimates the value of the subject injuries exceeds $600 million, which includes, but is not limited to, hundreds of millions of dollars of unpaid obligations for sums paid by HDL to BlueWave and flowing to Johnson and other subsequent transferees, originally derived from amounts paid by the government and non-government payers on insurance claims submitted by HDL in connection with the Illicit Scheme.

**E.     Johnson's Gains from the Illicit Scheme**

33.     For his efforts in facilitating and perpetuating the Illicit Scheme, Johnson was handsomely compensated by HDL in violation of the AKS and to the detriment of HDL and its creditors, including the Assigning Creditors.

34.     As reflected in the *Rule 26(b) Expert Report of Eric Hines CPA, CFF* filed in connection with the Qui Tam Action [Dkt. No. 445-3] (the "***Hines Expert Report***"), which is attached hereto as **Exhibit C**, between 2010 and the first quarter of 2015, HDL paid BlueWave more than $220.3 million in connection with the Illicit Scheme.  Under the control and direction of Dent and Johnson, BlueWave disbursed approximately $53.2 and $52.2 million of these monies to Dent and Johnson, respectively.  An additional $12.1 million was disbursed to various organizations with which Dent and/or Johnson were affiliated (collectively, the "***BlueWave***

*Payments*").  The BlueWave Payments have been traced by experts, leaving no room for doubt that Johnson acquired these funds by fraudulent and improper means.

35.     HDL also made a total of approximately $123.2 million in distributions from April 2011 to May 2015 to or for the benefit of Johnson and other HDL shareholders on account of their stock ownership (the "***Shareholder Distributions***").  The D&O Complaint includes as Exhibit B a schedule showing the dates, amounts, and recipients of the Shareholder Distributions.

### F.     DOJ Investigation

36.     On January 7, 2013, the Department of Justice (the "***DOJ***") issued a subpoena to HDL, commencing an extensive government investigation (the "***DOJ Investigation***") of HDL's business practices, which eventually led to the Qui Tam Action.

37.     Rather than immediately cease these illegal practices in the face of a government investigation, Johnson and other associated parties persisted in the Illicit Scheme.  HDL continued paying P&H fees to HCPs and millions of dollars to BlueWave while also leaving the PRCP intact. Furthermore, the BlueWave Parties, including Johnson, and the BlueWave Sales Force, at Johnson's direction, continued to market P&H and PRCP to HCPs; inducing HCPs to order medically unnecessary tests; and receiving commissions from HDL, all in violation of the AKS and in tortious interference with Private Payer contracts.

### G.     HDL's Insolvency

38.     From the moment HDL and the BlueWave Parties, including Johnson, agreed to the BlueWave Agreement and embarked on the Illicit Scheme, HDL began incurring millions of dollars in unrecognized liabilities to federal and state governments, Private Payers, and unsecured creditors, far beyond the value of its assets.

39.     At all relevant times, HDL was insolvent, and the amount of its liabilities exceeded the fair value of its assets. In addition, given the large and growing liability exposure that HDL did not acknowledge, at all relevant times, HDL had unreasonably small capital with which to conduct its business, and incurred or should have known it was incurring debts that it lacked the ability to pay as they came due.

**H.     HDL's Collapse**

40.     The DOJ Investigation and the spotlight it put on HDL's improper business practices, among other events, had a devastating impact on HDL's business. Exacerbating the company's financial woes, the OIG issued *Special Fraud Alert: Laboratory Payments to Referring Physicians* on June 25, 2014 ("***2014 Special Fraud Alert***"), which directly addressed the illegality of payments to HCPs in the nature of P&H.

41.     On April 9, 2015, HDL entered into a settlement with the DOJ (the "***DOJ Settlement***") pursuant to which HDL agreed to pay the federal government and several participating states a total of $47 million in fixed payments plus interest over a five-year period, increasing to $100 million upon the occurrence of certain triggering events.

42.     HDL filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code less than two month after the DOJ Settlement was reached.

**I.     HDL Bankruptcy**

43.     Following the HDL Petition Date, on May 12, 2016, the Court entered the order confirming the HDL Plan ("***Confirmation Order***") [HDL Bankruptcy Case, Dkt. No. 1095]. Pursuant to the HDL Plan and 11 U.S.C. § 1123, the Liquidating Trustee is the successor of both the debtors in the HDL Bankruptcy Case and the Official Committee of Unsecured Creditors and

is thereby vested with standing to bring the HDL Actions and this Adversary Proceeding as a representative of the HDL Trust.

## 1. D&O Action

44.     The D&O Complaint attached hereto as Exhibit A is the amended complaint filed in response to the *Memorandum Opinion* [D&O Action, Dkt. No. 363] issued by the Virginia Bankruptcy Court ruling that, with the exception of several counts, the Liquidating Trustee's original complaint complied with the pleading requirements under the Bankruptcy Rules and stated claims for which relief could be granted.

45.     The D&O Complaint currently asserts seventy-six (76) counts grounded in the wrongdoings carried out by the numerous party defendants, the ultimate result of which was a devastating financial blow to HDL's creditors, including the Assigning Creditors.

46.     Attached hereto as **Exhibit D** is a list of all claims asserted against Johnson in the D&O Complaint that the Liquidating Trustee states herein are non-dischargeable (collectively, the "***D&O Claims***").   Each count and paragraph of the D&O Complaint listed in Exhibit D are incorporated herein by reference.

## 2. Tax Action

47.     The Liquidating Trustee initiated the Tax Action against certain shareholders of HDL, including Johnson who owned a 1.5630% share therein (the "***HDL Shareholders***"), to recover damages resulting from the Revocation (as defined below), which action by the HDL Shareholders violated applicable law and contract and effectuated the loss of HDL's ability to recover tax refunds and/or credits for losses incurred by HDL in 2015.

48.     On or about February 16, 2009, HDL filed an election (the "***S Election***") to be classified as an S corporation (an "***S corporation***") under subchapter S, chapter 1, title 26 of the

United States Code. HDL also filed similar S corporation elections with certain state taxing authorities. All other states in which HDL did business either accepted the federal S corporation election or do not recognize S corporation status.

49. HDL's policy was to make distributions to HDL Shareholders to reimburse them for their tax liability associated with their ownership in HDL. This was consistent with the HDL Shareholders' agreement, a copy of which is attached to the Tax Complaint as Exhibit D (the "***Shareholders Agreement***").

50. In December 2014, HDL filed a Notice of Termination of S corporation status with the IRS and certain state taxing authorities, effective on January 1, 2015 (the "***Revocation***"). According to the Revocation, all of HDL's shareholders, including Johnson, consented to the termination of HDL's S corporation status. As a result of the Revocation, HDL became a C corporation.

51. As further detailed in the Tax Complaint, had HDL retained its S Election and filed its tax returns accordingly, the HDL Shareholders would have been able to utilize losses incurred in 2015 (the "***2015 Tax Loss***") to: (a) obtain refunds by amending their individual income tax returns for 2013 and 2014 (to the extent the 2015 Tax Loss could not be used on their individual income tax returns for 2015); and (b) return those refunds to HDL as would have been required under the Shareholders Agreement or applicable law.

52. Johnson also conspired with and aided and abetted others in accomplishing the Revocation, including, but not limited to the other party defendants to the Tax Action.

53. While the amount of the resulting loss to HDL and its creditors, including the Assigning Creditors, is to be proved at trial in the Tax Action, the Liquidating Trustee estimates that such damages exceed $50 million.

54.     Attached hereto as **Exhibit E** is a list of all claims asserted against Johnson in the Tax Complaint that the Liquidating Trustee states herein are non-dischargeable (collectively, the "*Tax Claims*").   Each count and paragraph of the Tax Complaint listed in Exhibit E are incorporated herein by reference.

## J.     Qui Tam Action

55.     The evidentiary record in the Qui Tam Action makes clear that Johnson acted knowingly and willfully in offering remuneration to HCPs to induce lab test referrals to HDL in exchange for massive commissions under the BlueWave Agreement in violation of federal law.

56.     The Qui Tam Court, in denying the defendants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, or in the alternative, for a new trial under Rule 59, found that a reasonable juror could "conclude that [Johnson] used remuneration to induce referrals and that HDL . . . agreed to pay Dent and Johnson commissions on a percentage of collected revenue to sell lab tests to physicians." *See* Qui Tam Action, Dkt. No. 906, at 8, a copy of which is attached hereto as **Exhibit F** (the "*Qui Tam Rule 50 & 59 Opinion*").   In addition to referencing the BlueWave Agreement as evidence thereof, the Qui Tam Rule 50 & 59 Opinion specifically cited:

> Before their scheme was implemented, [Johnson] agreed that P&H fees would be offered to physicians because "P&H is a critical door opener." (GTX 1288.2)[.] BlueWave sales representative Boomer Cornwell testified that he was trained by Dent and Johnson to use P&H fees as a selling point when marketing HDL and Singulex tests (Dkt. No. 837 at 353:12-358:8), and admitted that he had touted P&H fees to physician clients as "tremendous" and lucrative." (*Id*. at 458:13-17). Leonard Blasko referred to the P&H fees as an "economic thing." (*Id*. at 304:7-306:19.)[.] Kyle Martel asserted the Fifth Amendment to refuse to answer questions about how he used P&H as a sales strategy. (Dkt. No. 853 at 1045:21-1052:4; GTX 1162 (email form Kyle Martel to potential client conveying the "business opportunity" of a $20 P&H fee that would be "paid directly to the practice on each panel sent" and would generate a revenue stream of $2000 per week)[)]. *Id*.

57.     The Qui Tam Court also ruled that a reasonable juror could conclude that Johnson and his co-defendants "acted knowingly and willfully when they used remuneration to induce referrals" and that the "record is rife with examples of [Johnson] being warned by many individuals that the P&H fees at issue constituted illegal kickbacks." *Id*. at 9.  In making this finding, the Qui Tam Rule 50 & 59 Opinion pointed to the following:

> On December 13, 2010, attorney Lester Perling told [Johnson] that P&H was "as blatantly illegal as anything that I have ever seen in a long time. It would be a criminal violation of the federal and state kickback laws . . . and could form the basis for liability under the false claims act. It is absurd." (GTX 1266; *see also* GTX 1117.4-1117.6 (letter from potential client practice relaying the opinion from their attorney that "If the laboratory pays you for the Processing and Handling, but those functions are already paid for in the office visit payment, then the additional $17 that the laboratory is paying would be considered a kickback, paid to the medical practice to get the medical practice to use HDL rather than another lab."); 1122 (letter from compliance officer at Pathology labs alerting recipients to AKS implications of P&H payments). *Id*.

58.     The Qui Tam Rule 50 & 59 Opinion further held that "a reasonable juror could draw an adverse inference from evidence showing that Dent and Johnson tried to silence those who warned them about the illegality of their P&H fee practice," citing "testimony that Dent and Johnson terminated Emily Barron after her attorney warned them that P&H fees violated AKS." *Id*. at 9-10.

### K.     Johnson Bankruptcy Case

59.     In his Schedule F filed in the Johnson Bankruptcy Case, Johnson listed the liabilities asserted in the HDL Actions as unliquidated and disputed claims in varying amounts. *See* Johnson Bankruptcy Case, Dkt. No. 133.

### <u>COUNT I</u>

### 11 U.S.C. § 523(a)(2)(A) – Fraudulent Transfer Scheme Perpetrated by Johnson (as asserted in the D&O Complaint)

60.     Plaintiff repeats and realleges his allegations in the above paragraphs.

61. Based upon the facts and supporting evidence alleged herein, the amounts recoverable under the D&O Claims, Counts 1, 3, 5, 7, 9, 11, 37, 39, 41, 43, 45, 59, 60, 65 and 66 (collectively, the "***Count I Claims***") from Johnson are non-dischargeable under section 523(a)(2)(A) of the Bankruptcy Code as having created a debt or debts owed to Plaintiff for money or property obtained by Johnson by actual fraud in the form of a fraudulent conveyance scheme. Each of the Count I Claims seek to avoid and recover property that Johnson obtained through fraudulent conveyances effectuated by him with actual intent to hinder, delay or defraud HDL and its creditors, including the Assigning Creditors.

62. Johnson's conduct associated with the Illicit Scheme constitutes actual fraud.

63. By this fraudulent conduct, Johnson engaged in a pattern, practice and scheme of obtaining money and property from HDL, including the BlueWave Payments and the Shareholder Distributions, and otherwise benefiting from unsecured credit extended by the Assigning Creditors, while simultaneously creating debts or obligations to HDL and/or the Assigning Creditors in the form of the amounts recoverable under the Count I Claims.

64. Johnson's fraudulent conduct was done in full knowledge and/or reckless disregard of the illegality of the Illicit Scheme.

65. As the facts and supporting evidence alleged herein indicate, Johnson intended this fraudulent conduct to elicit the claims paid and the unsecured credit extended by the Assigning Creditors and the transfers from HDL, including the BlueWave Payments and the Shareholder Distributions, in furtherance of the BlueWave Agreement and the fraudulent conveyance scheme represented by the Count I Claims. Johnson further acted with actual intent to defraud HDL and its creditors, including without limitation, the Assigning Creditors, for the purpose of enriching himself, among other participants in the Illicit Scheme and defendants to the D&O Action.

66.     As a result of these fraudulent transfers, HDL and its creditors, including the Assigning Creditors, suffered damages in the amount of the Count I Claims.

67.     Based upon the foregoing, the Count I Claims arise from Johnson's actual fraud involving both moral turpitude and intentional wrong done with wrongful intent in connection with a fraudulent transfer scheme and, as such, are non-dischargeable under Bankruptcy Code § 523(a)(2)(A).

## COUNT II

### 11 U.S.C. § 523(a)(2)(A) – Fraud Committed by Johnson
### (as asserted in the D&O Complaint)

68.     Plaintiff repeats and realleges his allegations in the above paragraphs.

69.     Based upon the facts and supporting evidence alleged herein, the damages arising from D&O Claims, Counts 67, 71, 72 and 73 (collectively, the "*Count II Claims*") against Johnson are non-dischargeable under section 523(a)(2)(A) of the Bankruptcy Code as having created a debt or debts owed to Plaintiff for money, property, services and/or an extension of credit obtained by actual fraud.  Each of the Count II Claims seek to recover damages suffered by certain of the Assigning Creditors for false representations made and/or aided and abetted by Johnson in conspiracy with the other defendants to the D&O Action, to mislead and induce HDL's creditors, including the Assigning Creditors, into making payments to HDL, and in turn to BlueWave via the BlueWave Payments and the Shareholder Distributions, and into extending unsecured credit to HDL for goods and services provided by the Assigning Creditors.

70.     Johnson's conduct associated with the Illicit Scheme constitutes actual fraud.

71.     By this fraudulent conduct, Johnson engaged in a pattern, practice and scheme of benefiting from claims paid and unsecured credit extended by the Assigning Creditors in addition to obtaining money and property from HDL attributable to these same paid claims and unsecured

credit, including the BlueWave Payments and the Shareholder Distributions, while simultaneously creating debts or obligations to HDL and/or the Assigning Creditors in the form of the damages recoverable under the Count II Claims.

72.      Johnson's fraudulent conduct was done in full knowledge and/or reckless disregard of the illegality of the Illicit Scheme.

73.      As the facts and supporting evidence alleged herein indicate, Johnson intended this fraudulent conduct to elicit the payment of claims and extension of unsecured credit by the Assigning Creditors in furtherance of the Illicit Scheme and the BlueWave Agreement. Johnson further acted with actual intent to defraud HDL and its creditors, including without limitation, the Assigning Creditors, for the purpose of enriching himself, among other participants in the Illicit Scheme and defendants to the D&O Action.

74.      In reliance upon the misrepresentations made and/or aided and abetted by Johnson in conspiracy with the other party defendants to the D&O Action, the Assigning Creditors paid to HDL insurance claims submitted by HCPs and patients for HDL laboratory tests and suffered damages in the amount of the Count II Claims.

75.      Based upon the foregoing, the Count II Claims arise from Johnson's actual fraud involving both moral turpitude and intentional wrong done with wrongful intent and, as such, are non-dischargeable under Bankruptcy Code § 523(a)(2)(A).

## COUNT III

### 11 U.S.C. § 523(a)(6) – Willful and Malicious Injury Caused by Johnson
### (as asserted in the D&O Complaint)

76.      Plaintiff repeats and realleges his allegations in the above paragraphs.

77.      Based upon the facts and supporting evidence alleged herein, the amounts recoverable and/or the damages arising under D&O Claims, Counts 1, 3, 5, 7, 9, 11, 37, 39, 41,

43, 45, 55, 58-60, 65-67, and 69-73 (collectively, the "***Count III Claims***") against Johnson are non-dischargeable under section 523(a)(6) of the Bankruptcy Code as having created a debt or debts owed to Plaintiff for willful and malicious injury inflicted by Johnson on HDL and its creditors, including the Assigning Creditors.

78.     The Count III Claims seek amounts and/or damages under various causes arising from Johnson's participation and facilitation of the Illicit Scheme, including, but not limited to: (a) avoiding transfers and recovering property that Johnson obtained through fraudulent conveyances effectuated by him with actual intent to hinder, delay or defraud; (b) recovering damages for actual fraud perpetrated on HDL and its creditors, including the Assigning Creditors; and (c) recovering damages for additional injury caused to HDL and its creditors, including the Assigning Creditors, based on Johnson's related violation of the trust fund doctrine, his aiding and abetting other party defendants in breach of their fiduciary duty, conspiracy, and tortious interference with contract, in particular, with those contracts between Private Payers and HCPs and/or patients.

79.     Johnson intentionally participated in and perpetuated the Illicit Scheme as well as willfully aided and abetted and conspired with others, including the other party defendants to the D&O Action, in effectuating the same.

80.     As a result of Johnson's conduct, HDL and its creditors, including the Assigning Creditors, suffered damages in the amount of the Count III Claims.

81.     Johnson intended the Illicit Scheme to injure HDL and its creditors, including the Assigning Creditors, for the purpose of enriching himself, among other participants in the Illicit Scheme and party defendants to the D&O Action.  Furthermore, the injuries inflicted on HDL and its creditors, including the Assigning Creditors, were substantially certain to result from the Illicit

Scheme. The damages represented by the Count III Claims were the inevitable result of an illegal, fraudulent and tortious business scheme premised on overpayments from government and Private Payers derived from inducing HCPs to order medically unnecessary tests.

82.     Related to the same, Johnson's conduct associated with the Illicit Scheme was wrongful, without just cause and excessive. Examples of the malicious nature, either actual, implied or constructive, of Johnson's activities include, but are not limited to: Johnson's knowledge of the illegal, fraudulent and tortious nature of the Illicit Scheme; Johnson's disregard of numerous warnings regarding the Illicit Scheme; the immensity of the harm inflicted on HDL and its creditors, including the Assigning Creditors; and the great lengths taken by Johnson to create, preserve, perpetuate and otherwise continue the Illicit Scheme.

83.     Based upon the foregoing, the Count III Claims arise from Johnson's willful and malicious injury to HDL and its creditors, including the Assigning Creditors, and, as such, are non-dischargeable under Bankruptcy Code § 523(a)(6).

## COUNT IV

### 11 U.S.C. § 523(a)(6) – Willful and Malicious Injury Caused by Johnson
### (as asserted in Tax Complaint)

84.     Plaintiff repeats and realleges his allegations in the above paragraphs.

85.     Based upon the facts and supporting evidence alleged herein, the damages arising under Tax Claims, Counts 3-6 (collectively, the "*Count IV Claims*") against Johnson are non-dischargeable under section 523(a)(6) of the Bankruptcy Code as having created a debt or debts owed to Plaintiff for willful and malicious injury caused by Johnson to HDL and its creditors, including the Assigning Creditors. Each of the Count IV Claims seek to recover damages from

Johnson for harm caused to HDL and its creditors, including the Assigning Creditors, arising from Johnson's participation in the Revocation.

86. Johnson intentionally consented to the Revocation as well as willfully aided and abetted and conspired with others, including the other defendants to the Tax Action, in effectuating the same.

87. As a result of Johnson's conduct, HDL and its creditors, including the Assigning Creditors, suffered damages in the amount of the Count IV Claims.

88. Johnson intended the Revocation to injure HDL and its creditors, including the Assigning Creditors, for the purpose of enriching himself, among other participants in the Revocation and party defendants to the Tax Action. Specifically, he sought to shift tax liabilities from himself to HDL to avoid personal liability on pass-through tax obligations that HDL had previously funded but which, at the time of the Revocation, the company could no longer afford to pay.

89. The injuries inflicted on HDL and its creditors, including the Assigning Creditors, were substantially certain to result from the Revocation. The subsequent 2015 Tax Loss inevitably followed the Revocation, particularly considering HDL's deteriorating financial situation and mounting liabilities arising from the Illicit Scheme, including the imminently foreseeable DOJ Settlement.

90. Related to the same, Johnson's conduct associated with the Illicit Scheme was wrongful, without just cause and excessive. Examples of the malicious nature, either actual, implied or constructive, of Johnson's activities include, but are not limited to: the Revocation was tax neutral to the HDL Shareholders, but impaired HDL's ability to utilize tax benefits in the form of losses or credits which would otherwise have been available to the company and its creditors;

Johnson ignored or failed to consider the effect of the Revocation on his and/or the HDL Shareholder's abilities to seek tax refunds, which would have made retaining HDL's S corporation status tax neutral to them and avoided significant harm to HDL and its creditors; and, Johnson did so in the face of the language of the Shareholder's Agreement, which had otherwise preserved HDL's rights to the 2015 Tax Loss.

91.     Based upon the foregoing, the above debts arise from Johnson's willful and malicious injury to HDL and its creditors, including the Assigning Creditors, and, as such, are non-dischargeable under Bankruptcy Code § 523(a)(6).

## PRAYER FOR RELIEF

**WHEREFORE**, the Liquidating Trustee respectfully requests that this Court enter an Order and Judgment:

A.     On Count I, finding that the amounts recoverable from the Count I Claims are non-dischargeable under Bankruptcy Code § 523(a)(2)(A);

B.     On Count II, finding that the damages arising from the Count II Claims are non-dischargeable under Bankruptcy Code § 523(a)(2)(A);

C.     On Count III, finding that the amounts recoverable and/or the damages arising from the Count III Claims are non-dischargeable under Bankruptcy Code § 523(a)(6);

D.     On Count IV, finding that the damages arising from the Count IV Claims are non-dischargeable under Bankruptcy Code § 523(a)(6); and

E.     Granting Plaintiff such other and further relief as this Court may find just and proper.

<u>Defendant's Address</u>:
Robert Bradford Johnson
3220 County Road 1428
Vinemont, AL 35179


Dated: September 12, 2018                    Respectfully Submitted,

                                            /s/ Daniel D. Sparks
                                            Daniel D. Sparks
                                            Bradley R. Hightower
                                            Attorneys for Richard Arrowsmith
                                            Permanent Liquidating Trustee
                                            of the HDL Liquidating Trust

<u>Of Counsel</u>
Christian & Small LLP
1800 Financial Center
505 North 20th Street
Birmingham, AL 55203
(205) 795-6588
ddsparks@csattorneys.com
brhightower@csattorneys.com

                                            Richard S. Kanowitz
                                            (admitted pro hac vice)
                                            Attorney for Richard Arrowsmith
                                            Permanent Liquidating Trustee
                                            of the HDL Liquidating Trust

<u>Of Counsel</u>
Cooley, LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 479-6000
rkanowitz@cooley.com

                                            Cullen D. Speckhart
                                            (admitted pro hac vice)
                                            Attorney for Richard Arrowsmith
                                            Permanent Liquidating Trustee
                                            of the HDL Liquidating Trust

Of Counsel
Wolcott Rivers Gates
919 E .Main Street
Richmond, VA 23219
200 Bendix Road, Ste. 300
Virginia Beach, VA 23452
(757) 497-6633
cspeckhart@wolriv.com